**Affirmed in part; Reversed in part and Opinion Filed May 4, 2021**



In the

## Court of Appeals
## Fifth District of Texas at Dallas

_____

### No. 05-20-00937-CV
_____

### RETAIL SERVICES WIS CORPORATION D/B/A PRODUCT CONNECTIONS, NATHAN STOUT, AMANDA VILLA, AND KATHERINE PALMER, Appellants
### V.
### CROSSMARK, INC., Appellee

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-05122-2020**

## MEMORANDUM OPINION
Before Justices Schenck, Reichek, and Carlyle
Opinion by Justice Carlyle

Appellee Crossmark, Inc. filed this lawsuit after appellants Nathan Stout, Amanda Villa, and Katherine Palmer left its employ and went to work for appellant Retail Services WIS Corp. d/b/a Product Connections. In this accelerated interlocutory appeal, appellants challenge the trial court's order granting a temporary injunction requested by Crossmark. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4).

Appellants contend the trial court abused its discretion when it signed the temporary injunction order because (1) the order is overbroad and vague in violation of Texas Rule of Civil Procedure 683, (2) Crossmark failed to satisfy the requirements for injunctive relief, and (3) the portion of the temporary injunction order granting Crossmark access to appellants' electronic devices does not comply with Texas law. We reverse the temporary injunction order in part and remand in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

**Background**

Crossmark and Product Connections are competitors in the business of providing large retailers with "in-store consumer experience" services, including "public in-store demonstrations for consumers to directly interact with brand spokespersons and sample a range of products." Product Connections CEO Jim Rose is a former Crossmark executive.

Crossmark filed this lawsuit on October 6, 2020, against appellants, Mr. Rose, and two other former Crossmark employees, John Jason Gramling and Casey King. The causes of action asserted were (1) "breach of contract/breach of non-disclosure (actual and probable)," "breach of contract–non-solicitation," and breach of fiduciary duty against the former employee defendants; (2) "breach of contract–non-compete" against Mr. Gramling, Mr. Stout, and Ms. Villa; (3) "violations of the Texas Uniform Trade Secrets Act (actual and probable)" and conspiracy against all defendants; (4) conversion against Product Connections; and (5) "tortious

interference with contract" against Product Connections and Mr. Rose. Specifically, Crossmark complained of improper solicitation of its employees and clients and improper use of confidential information pertaining to its "digital transformation/virtual engagement" product and strategy and its "playbook" that "has taken decades to develop" and "includes a wealth of confidential information such as best practices, protocols, operating procedures, manuals, training guides, and other documents."

Crossmark's petition also sought several types of injunctive relief, including a temporary injunction that would not only enjoin certain acts but also require the defendants to produce company and personal digital storage devices for forensic review by Crossmark's expert.

The attachments to Crossmark's petition included, among other things, (1) contracts executed by Mr. Stout and Ms. Villa containing confidentiality, non-compete, and non-solicitation provisions, and (2) a contract purportedly executed electronically by Ms. Palmer containing confidentiality and non-solicitation provisions. The non-compete provisions in those contracts applied for six months after termination of employment and the non-solicitation provisions applied for one year after employment terminated. There was no time limit on the confidentiality provisions.

At the October 20, 2020 hearing on Crossmark's application for a temporary injunction, Crossmark presented evidence from four witnesses: Crossmark's

retained forensic expert, David Cowen; Crossmark executive vice president Bryan Lynch; and Crossmark employees Cody Long and Becca Williams. Product Connections called a single witness, Ms. King. The evidence also included the employment contracts described above.

Mr. Cowen testified he is a managing director in cyber services at KPMG. Crossmark retained him to conduct a forensic examination of a Crossmark "Windows 10" laptop computer provided to Ms. King during her Crossmark employment and "an external storage device otherwise known as a thumb drive" that was "returned by Miss King upon request by Crossmark" after her termination date. His examination showed that on June 12, 2020, Ms. King downloaded "a file that appears to be the offer that she got from Product Connections" and "emptied her recycle bin" by deleting more than 1,800 files placed in the bin during the previous two years. On June 18, 2020, the thumb drive was plugged into Ms. King's Crossmark laptop and thirteen files were copied from the laptop onto the thumb drive. A list of those files compiled by Mr. Cowen was admitted into evidence. Mr. Cowen testified that subsequently, on June 30, 2020, and July 27, 2020, the thumb drive was plugged into a "Mac computer, which is not her Crossmark computer" and those files were "accessed." On June 19, 2020, there was a Google search on Ms. King's Crossmark laptop for "how to delete Google Chrome cache," and 57,000 Chrome cache entries were deleted. Mr. Cowen stated it is his understanding that Ms. King was still working for Crossmark on June 19, 2020.

Mr. Lynch testified Mr. Stout, Ms. Villa, and Ms. Palmer reported directly to him while they were employed at Crossmark and Ms. King reported to him indirectly through Ms. Palmer. All four employees worked on the "events team" for Crossmark's Client X,[1] which Mr. Lynch oversaw. Mr. Lynch stated Crossmark's records show all four employees signed confidentiality agreements.

According to Mr. Lynch, the events team utilized information that Crossmark considers confidential, including multiple playbooks and digital transformation strategies. One such strategy is a "digital demo" product Crossmark began working on in December 2019 and launched in May 2020, which replaces the product demonstration associate with "an interface where the [consumer] is allowed to, through the—the use of QR code, gain incremental knowledge." Mr. Lynch testified Crossmark's digital demo product currently in stores "is just the tip of the iceberg" and "is a multigenerational strategy" that Crossmark is working to enhance in various ways it considers confidential. Both Ms. Palmer and Ms. King worked on the digital demo product and digital transformation strategy. Ms. Palmer had a central role in putting together the Client X presentation for the digital demo product. Mr. Lynch stated Crossmark took multiple steps to protect the digital transformation

---

[1] Appellee's appellate brief and substantial portions of this appeal's record were filed under seal. Additionally, following oral submission in this Court, the trial court signed two permanent sealing orders covering specified portions of the record. Regarding the sealed materials, we make "every effort to preserve the confidentiality of the information the parties have designated as confidential," *MasterGuard L.P. v. Eco Techs. Int'l, LLC*, 441 S.W.3d 367, 371 (Tex. App.—Dallas 2013, no pet.), consistent with our obligation to hand down a public opinion explaining our decisions based on the record. *See Kartsotis v. Bloch*, 503 S.W.3d 506, 510 (Tex. App.—Dallas 2016, pet. denied).

strategy documents and information it considered confidential, including limiting access to electronic information and requiring employees to sign confidentiality agreements. He stated this information would give a competitor "insight into what we're working on" and an opportunity "to cut corners and create a shortcut to allow them to be able to compete effectively and potentially even, you know, take it further faster than we are."

Mr. Lynch stated those four employees left Crossmark at different times. Mr. Stout and Ms. Villa left in August 2019. They resigned on the same day and both told Mr. Lynch they were leaving for personal reasons. According to Mr. Lynch, Mr. Stout denied any knowledge of Product Connections or WIS Corporation and denied he was planning to work for either one. Neither Mr. Stout nor Ms. Villa mentioned option-to-hire agreements they had negotiated with Product Connections. Ms. Palmer resigned in January 2020 and told Mr. Lynch her new employer had asked that she not publicize where she was going. Ms. King resigned in June 2020 and also declined to share where she was going.

Mr. Lynch stated he became "concerned" when, less than a week after Crossmark launched its digital demo product in May 2020, he saw on social media that Product Connections was launching an "eerily similar execution" that was "a very strong replica of the work we had been working on." He stated the social media video he saw "mirrored almost identically what we had done" in the Client X digital demo presentation. Both Ms. Villa and Ms. Palmer appeared in the social media

video. Related social media posts mentioned that Product Connections' technology was "patent pending." Mr. Lynch also (1) testified that the names of "a lot" of the files on the list of "accessed" thumb drive files described above suggested they "might relate to work that Miss King did at Crossmark" and (2) explained that his basis for that reasoning was that multiple file names on the list contained terms pertaining to Crossmark's Client X services.

Mr. Long testified that in June 2020, he was on furlough from Crossmark due to the Covid-19 pandemic. Mr. Stout, a work acquaintance formerly at Crossmark, sent him a LinkedIn message asking how he was doing. Mr. Stout's LinkedIn message asked Mr. Long to call him "to catch up" and stated, "I would suggest that you don't let people know I reached out to check up on you. Red flags or penalty flags would come down everywhere." When Mr. Long called him, Mr. Stout told Mr. Long about a new position opening up at Product Connections that was similar to Mr. Long's current position at Crossmark. Mr. Stout told Mr. Long he had spoken with customers and merchants in the industry, including specific Crossmark customers, and Mr. Long "came highly recommended." Mr. Stout asked him not to tell people about their phone conversation and told him Mr. Gramling or Ms. Palmer would "reach out" to him about the position.

Ms. Williams testified that prior to Ms. Villa's departure from Crossmark, Ms. Villa was her supervisor and they were friends. Ms. Williams stated Ms. Villa told her "confidential information that she said that she was not supposed to share."

Specifically, on one occasion during a Crossmark shopper event "there was a meeting that was being held in Dallas." Ms. Villa, Mr. Gramling, and Mr. Stout "were telling people that the meeting was to go with the client to audit [stores]," but Ms. Williams "later found out that they were actually going to meet with Jim Rose while they were in Dallas." Ms. Williams stated, "It was later on down the road that I found out that the plan was to not continue employment with Crossmark long-term but to continue to explore opportunities outside of Crossmark with Jason and Jim Rose."

Ms. King testified that the only files she transferred from her Crossmark computer to the thumb drive were personal files. She stated she did not take any Crossmark data, did not give Product Connections any Crossmark confidential or proprietary data, and did not intend to steal or misappropriate any Crossmark confidential or trade secret data.

The trial court signed an October 23, 2020 order granting Crossmark a temporary injunction against Product Connections, Mr. Stout, Ms. Villa, and Ms. Palmer. The temporary injunction states appellants are "enjoined" from:

> (a) offering for sale, marketing or selling any product or services derived in whole or in part from CROSSMARK trade secret or confidential information.

> (b) using, disclosing or transferring, or assisting or encouraging others to use, disclose or transfer, any trade secret, confidential, or proprietary information, knowledge, know-how, reverse know-how, documents, data, or other intellectual property of CROSSMARK, including, but not limited to, any trade secret or confidential information, knowledge, know-how, reverse know-how, documents, data or other intellectual

property that any Former Employee received, maintained, developed or had access to during or after the course of his or her employment at CROSSMARK.

(c) interfering with any contracts or agreements CROSSMARK has with any current or former employees, including, but not limited to, knowingly hiring any CROSSMARK current or former employees to cause them to breach any agreement with CROSSMARK or otherwise encouraging such employees to breach any restrictive covenants owed to CROSSMARK.

(d) (i) the Former Employees are prohibited from recruiting or soliciting, or attempting to recruit or solicit, directly, indirectly or by assisting or encouraging others, any persons formerly or currently employed by or associated with CROSSMARK, or contacting or communicating with or directing or assisting others in connecting or communicating with, any such current or former employees for the purpose of inducing such persons to terminate their employment with CROSSMARK; and (ii) Product Connections will refrain from recruiting or soliciting, or attempting to recruit or solicit, directly, indirectly, or by assisting or encouraging others, any persons formerly or currently employed by or associated with CROSSMARK, any such current or former employees for the purpose of obtaining CROSSMARK confidential and proprietary information or to induce CROSSMARK's clients and customers to divert, withdraw, curtail or cancel any of their business with CROSSMARK; notwithstanding this restriction, nothing prevents any CROSSMARK employees from responding to a general solicitation not specifically targeted toward him or her, or from initiating contact with Product Connections on their own volition and initiative, and without any direct or indirect solicitation by Product Connections.

(e) for a period of (6) months, Stout and Villa are prohibited from, on behalf of a competitor, including Product Connections, (i) directly or indirectly servicing, diverting, or taking away any Covered Clients and Customers, (ii) directly or indirectly providing a service to Covered Clients and Customers, or (iii) conducting any business on behalf of Product Connections or any other business that offers events and retail merchandising services that are substantially similar to the activities Stout and Villa conducted on behalf of CROSSMARK.

(f) interfering with any contracts or agreements CROSSMARK has with [Client X and Client Y], or otherwise directly or indirectly, or by assisting or encouraging others, taking any steps to cause any current client or customer of CROSSMARK, including [Client X and Client Y], to divert, withdraw, curtail or cancel any of their business with CROSSMARK.

(g) the Former Employees are prohibited from soliciting or attempting to solicit, directly or indirectly, or by assisting or encouraging others, to call on or market services or products to CROSSMARK Covered Customers and Clients.

(h) inducing or attempting to induce or soliciting or attempting to solicit, in any manner, directly or indirectly, or by assisting or encouraging others, or calling on, marketing products or services to, or performing engagements for [Client X or Client Y]; notwithstanding this prohibition, (i) Product Connections is not prohibited from responding to an RFP from [Client X and Client Y] that either initiates on its own volition, without direct or indirect solicitation by Product Connections, or (ii) if CROSSMARK is terminated by [Client X or Client Y] prior to the expiration of any current agreement's term without solicitation or interference by Product Connections, this provision does not prohibit Product Connections from responding to a request for proposal received from that client or customer.

(i) prohibiting and restraining Palmer from working for Product Connections or any other competitor's events and retail merchandising business in a capacity that would likely result in the Former Employees' use or disclosure of CROSSMARK trade secrets or confidential or proprietary information, including specifically trade secret, confidential and proprietary information relating to digital transformation, virtual engagement, and digital demo services.

(j) prohibiting Product Connections from including in its virtual engagement experience or digital demo product any features, benefits and functionality that is or derives from CROSSMARK's trade secret, confidential or proprietary information, including any innovation that Palmer learned of while employed by CROSSMARK.

(k) altering, deleting, removing or writing over in any respect any documents, computer files (including, but not limited to, e-mails, hard drives, thumb drives, disc drives, zip drives), data, drafts or other

materials obtained from or belonging to CROSSMARK or containing or referring to CROSSMARK's trade secrets or confidential or proprietary information, including any such devices, servers or other storage means, to which CROSSMARK documents or confidential information have been copied.

(l) altering, deleting, removing or writing over in any respect any documents, computer files (including, but not limited to, e-mails, hard drives, thumb drives, disc drives, zip drives), data, communications, drafts or other things relating in any way to (i) any business relationship between the Former Employees and existing or prospective customers or clients of CROSSMARK to whom the Former Employees provided or plan to provide products and/or services since leaving CROSSMARK, until such time as those materials may be turned over in discovery or until further order of the Court; (ii) the Former Employees' actual or potential employment by Product Connections, including any contact of the Former Employees by anyone at Product Connections before they became employed by Product Connections; (iii) the Former Employees' solicitation or recruitment of persons employed by CROSSMARK to join Product Connections until such time as those materials may be turned over in discovery or until further order of the Court; and (iv) the Former Employees' direct or indirect attempts to solicit from or perform for any Covered Client or Customer any services which are similar to or the same as any services that CROSSMARK performs or solicits.

Additionally, the temporary injunction contains a "Device Turnover Order"

(DTO) that states:

The Court **further ORDERS** that, in light of Defendants' conduct to date which reveals efforts of deception and concealment and actual misappropriation of CROSSMARK Confidential Information by at least one Former Employee, and in order to maintain the status quo, Defendants must immediately produce to CROSSMARK's outside counsel for forensic inspection any company or personal laptops, hard drives, thumb drives (including all thumb drives used by any Former Employee while working for CROSSMARK) or other digital storage devices (1) used by the Former Employees in their work for Product Connections and which contain CROSSMARK information, (2) used by the Former Employees while working for CROSSMARK, and (3) in possession of Defendants on which may be maintained

–11–

CROSSMARK's Confidential Information and Trade Secrets. CROSSMARK shall treat the production of these devices as "Attorneys' Eyes Only," as defined in the Proposed Protective Order filed conjunctively with this Petition, and shall only permit a forensic expert to review these devices after signing the protective order on an "Attorneys' Eyes Only" basis.

Appellants filed a November 5, 2020 "Emergency Motion to Clarify Device Turnover Order." They contended, among other things, that (1) "there exists a dispute between the Parties as to whether the three prongs in the Device Turnover Order are intended to be conjunctive or disjunctive"; (2) the phrase "may be maintained" and the term "CROSSMARK information" are excessively broad; and (3) the DTO is improper because "Crossmark made no showing that it is unable to acquire appropriate discovery through reasonable means, or that Defendants would not comply with such requests."[2] The trial court held a November 17, 2020 hearing at which it orally "clarified" that the order requires appellants to turn over any devices that meet any one of the three prongs and that the third prong's phrase "may be maintained" means "is maintained." After this appeal was filed, this Court granted appellants' request to stay the DTO pending this appeal's resolution.

**Analysis**

---

[2] On that same date, appellants also filed a request for findings of fact and conclusions of law in which they asked that the trial court (1) specify the causes of action as to which Crossmark "has shown itself entitled to injunctive relief based on a probable right to relief" and (2) "issue findings of fact on the basis of its ruling that Plaintiff has shown a "probable, irreparable, and imminent injury" in the event Defendants are not prohibitively enjoined as set forth in the Order (items (a)–(l)), and mandatorily enjoined to immediately produce their personal and work computers, hard drives, and other storage devices for forensic examination, as ordered . . . ." The trial court did not file findings of fact or conclusions of law.

The purpose of a temporary injunction is to preserve the status quo of the subject matter of a suit pending a trial on the merits. *Wimbrey v. WorldVentures Mktg., LLC*, No. 05-19-01520-CV, 2020 WL 7396007, at *2 (Tex. App.—Dallas Dec. 17, 2020, no pet.) (mem. op.) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)). The extraordinary equitable remedy of an injunction must be carefully regulated and confined to proper cases. *El Tacaso, Inc. v. Jireh Star, Inc.*, 356 S.W.3d 740, 743 (Tex. App.—Dallas 2011, no pet.).

There are two general types of temporary injunctions: prohibitive and mandatory. *Health Care Servs. Corp. v. E. Tex. Med. Ctr.*, 495 S.W.3d 333, 337 (Tex. App.—Tyler 2016, no pet.). A prohibitive injunction forbids conduct, and a mandatory injunction requires it. *Id*.

To obtain a temporary injunction, the applicant must plead and prove three elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. The probable right to relief element does not require the applicant to show that it will prevail at trial, nor does it require the trial court to evaluate the probability that the applicant will prevail at trial. *Young Gi Kim v. Ick Soo Oh*, No. 05-19-00947-CV, 2020 WL 2315854, at *2 (Tex. App.—Dallas May 11, 2020, no pet.) (mem. op.). Rather, it requires the applicant to present enough evidence to raise a bona fide issue as to its right to ultimate relief. *Id*. This requires the applicant to produce some evidence supporting every element of at least one valid legal theory.

*Id*.; *see also Dallas Anesthesiology Assocs., P.A. v. Tex. Anesthesia Grp., P.A*., 190 S.W.3d 891, 896–97 (Tex. App.—Dallas 2006, no pet.) ("To establish a probable right to the relief sought, an applicant is required to allege a cause of action and offer evidence that tends to support the right to recover on the merits."). A party proves irreparable injury for injunction purposes by proving damages would not adequately compensate the injured party or cannot be measured by any certain proper pecuniary standard. *Young Gi Kim*, 2020 WL 2315854, at *5. A preliminary mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship. *Health Care Servs*., 495 S.W.3d at 238 (citing *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex.1981)).

Texas Rule of Civil Procedure 683 requires every order granting a temporary injunction to state the reasons for its issuance, be specific in terms, and describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained. TEX. R. CIV. P. 683. The purpose of the rule is to ensure that parties are adequately informed of the acts they are enjoined from doing and why they are enjoined from doing them. *El Tacaso*, 356 S.W.3d at 744. Thus, the order must be specific and legally sufficient on its face and not merely conclusory, and it must be definite, clear and precise as possible. *See id*. The trial court must set out in the temporary injunction order the reasons the court deems it proper to issue the injunction, including the reasons why the applicant will suffer injury if the injunctive relief is not ordered. *Id*. (citing *State v. Cook United, Inc*., 464

S.W.2d 105, 106 (Tex. 1971)); *see Freedom LHV, LLC v. IFC White Rock, Inc.*, No. 05-15-01528-CV, 2016 WL 3548012, at *2 (Tex. App.—Dallas June 28, 2016, pet. dism'd) (mem. op.) ("[C]onclusory recitals of the elements of a temporary injunction without explanation, including about how [applicant] would suffer probable, imminent, and irreparable harm absent injunctive relief, are insufficient."). The requirements of rule 683 are mandatory and must be strictly followed, even if a sound reason for granting relief appears elsewhere in the record. *El Tacaso*, 356 S.W.3d at 745.

The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court. *E.g., Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *Health Care Servs.*, 495 S.W.3d at 338. A reviewing court should reverse an order granting injunctive relief only if the trial court abused its discretion. *Butnaru*, 84 S.W.3d at 204; *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985) (trial court abuses its discretion when it acts arbitrarily or without reference to any guiding rules or principles). Our abuse-of-discretion review requires that we "view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor," and defer to the trial court's resolution of conflicting evidence. *Amend v. Watson*, 333 S.W.3d 625, 627 (Tex. App.—Dallas 2009, no pet.); *see also McGuire-Sobrino v. TX Cannalliance LLC*, No. 05-19-01261-CV, 2020 WL 4581649, at *6 (Tex. App.—Dallas Aug. 10, 2020,

no pet.) (mem. op.) (trial court has broad discretion in determining whether pleadings and evidence support temporary injunction).

**Challenge to temporary injunction elements**

We begin with appellants' second issue, in which they contend the trial court abused its discretion by granting injunctive relief because Crossmark did not satisfy the second and third temporary injunction elements—a probable right to relief and a probable, imminent, and irreparable injury in the interim.[3]

### Probable right to relief

We disagree with appellants' position that no probable right to relief was shown. Crossmark asserted a TUTSA claim against all defendants. *See* TEX. CIV. PRAC. & REM. CODE §§ 134A.001–.008. The elements of a TUTSA claim are: (1) ownership of a trade secret; (2) misappropriation of the trade secret; and (3) an injury, if the plaintiff is seeking damages. *E.g.*, *EJ Madison, LLC v. Pro-Tech Diesel, Inc.*, 594 S.W.3d 632, 643–44 (Tex. App.—El Paso 2019, no pet.) (citing TEX. CIV. PRAC. & REM. CODE §§ 134A.002(1), (3), (6), 134A.004(a)). TUTSA defines "trade secret" as any type of information that the owner has taken reasonable measures to keep secret and which derives economic value, potential or actual, from not being generally known to others who can obtain economic value from the disclosure or

---

[3] We address this issue first because its resolution would accord appellants the greatest relief in that sustaining the argument would undermine the entire basis of Crossmark's right to an injunction. *See* *Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *1, 6 (Tex. App.—Fort Worth Feb. 11, 2021, no pet.) (mem. op.).

use. TEX. CIV. PRAC. & REM. CODE § 134A.002(6). "Misappropriation" includes "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; [or] (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was: (a) derived from or through a person who used improper means to acquire the trade secret; (b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or (c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret." *Id*. § 134A.002(3). "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." *Id*. § 134A.002(2).

Appellants contend (1) "Crossmark admits that the Digital Demo Product and its components are readily observable and thus not 'secret'"; (2) "Crossmark presented no actual evidence that any Appellant acquired Crossmark's alleged trade secrets by improper means"; and (3) Crossmark cannot satisfy its burden "without some evidence of use or injury."

As to the existence of a trade secret, Mr. Lynch testified (1) Crossmark possesses information it considers confidential, including playbooks and digital

transformation strategies, that would give a competitor "insight into what we're working on" and an opportunity "to cut corners and create a shortcut to allow them to be able to compete effectively and potentially even, you know, take it further faster than we are"; (2) Crossmark takes multiple steps to protect that information, including limiting access and requiring employees to sign confidentiality agreements; and (3) the digital demo display customers see in stores is "just the tip of the iceberg" and does not constitute the entirety of Crossmark's strategy.

The evidence also showed (1) Mr. Stout, Ms. Villa, Ms. Palmer, and Ms. King worked on the same Client X events team at Crossmark; (2) Mr. Stout and Ms. Villa concealed their intentions to join Product Connections; (3) Ms. Palmer joined Product Connections in February 2020, just as Mr. Stout's and Ms. Villa's non-compete agreements were expiring; (4) a few months later, just as Crossmark was launching its digital demo product for which it was planning additional enhancements, Product Connections announced its "eerily similar execution" that was "a very strong replica" of Crossmark's and was described as "patent pending"; (5) both Ms. Villa and Ms. Palmer appeared in Product Connections' related social media video, which "mirrored almost identically what [Crossmark] had done" in the Client X digital demo presentation; (6) Ms. King left Crossmark for Product Connections shortly thereafter with a thumb drive containing files downloaded from her Crossmark computer with names pertaining to Crossmark client services; and (7) those files were accessed on a different computer after she left Crossmark.

Though appellants argue "Crossmark's allegations about King simply do not support relief against *Appellants*," her actions, along with the other evidence, support an inference of appellants' participation in concerted acts to improperly acquire and use Crossmark's trade secrets. On this record, we conclude the trial court did not abuse its discretion by determining Crossmark presented enough evidence to raise a bona fide issue as to its right to ultimate relief on its TUTSA claim. *See Young Gi Kim*, 2020 WL 2315854, at *2; *see also Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *17–18 (Tex. App.—Fort Worth Feb. 11, 2021, no pet.) (mem. op.) (rejecting no-probable-right-to-relief attacks to temporary injunction that were based on disagreement with trial court's inferences regarding obtaining and use of confidential information).

**Probable, imminent, and irreparable injury**

As to a probable, imminent, and irreparable injury in the interim, appellants assert Crossmark "presented nothing more than speculation and conjecture regarding Appellants' actions and Crossmark's feared injuries" and failed to show it could not be adequately compensated in damages. We disagree.

We have already addressed and rejected appellants' challenge to the proof of their actions in taking and using Crossmark's confidential information regarding a "multigenerational" digital demo product for which multiple enhancements are planned. *See Hernandez*, 2021 WL 520456, at *18 (noting that same already-challenged inferences supporting proof of alleged use of confidential information

–19–

supported imminent injury element). Additionally, Mr. Lynch testified Crossmark's confidential digital transformation strategy information would give a competitor "insight into what we're working on" and an opportunity "to cut corners and create a shortcut to allow them to be able to compete effectively and potentially even, you know, take it further faster than we are." Thus, the trial court did not abuse its discretion by determining Crossmark satisfied its burden as to probable, imminent harm. *See IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.) (concluding imminent injury element was established where evidence showed defendants had possession of plaintiff's data entitled to trade secret protection and were actively using that information to compete with plaintiff).

Further, the use of confidential information in cases such as this has been described as "the epitome of irreparable injury." *Hernandez*, 2021 WL 520456, at *21 (citing *Thomas v. A*Med Mgmt., Inc.*, No. 01-19-00564-CV, 2020 WL 5269412, at *5 (Tex. App.—Houston [1st Dist.] Sept. 3, 2020, no pet.) (mem. op.) (listing cases holding that damages for loss of customer goodwill and use of confidential information by a former employee may be difficult to quantify and constitute an irreparable injury)). Because the evidence showed a probable, imminent injury that cannot be measured by any certain proper pecuniary standard, the irreparable injury element was satisfied. *See Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) ("[A]ssigning a dollar

amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.")); *Mabrey v. Sandstream, Inc.*, 124 S.W.3d 302, 319 (Tex. App.—Fort Worth 2003, no pet.) ("Irreparable harm may be established by evidence that disclosure of confidential information could enable competitors to mimic the marketing plans and strategies of the applicant and avoid the less successful strategies . . . ."); *see also Sandberg v. STMicroelectronics, Inc.*, 600 S.W.3d 511, 537 (Tex. App.—Dallas 2020, pet. filed) ("Because the evidence showed Sandberg likely retained ST's confidential information and had used or disclosed it, the trial court could find that ST was facing imminent harm, had suffered an irreparable injury, and had no adequate remedy at law.").

**Compliance with rule 683 requirements**

Next, we turn to appellants' first issue, in which they contend the temporary injunction should be "dissolved" because it does not comply with rule 683's requirements.

### Reasons why irreparable injury will result

According to appellants, the temporary injunction fails to comply with rule 683 because it "does not state or explain the reasons why irreparable injury will result absent an injunction." *See El Tacaso*, 356 S.W.3d at 744. Appellants also assert that the DTO, as a mandatory injunction, is subject to the "more rigorous standard" of "necessary to prevent irreparable injury or extreme hardship," which the order does not address.

The temporary injunction order states:

> If Defendants are not enjoined as requested herein, CROSSMARK's Confidential Information and Trade Secrets that CROSSMARK has spent significant time, talent, and effort cultivating, are threatened, thereby causing irreparable harm to CROSSMARK's trade secrets, client relationships, goodwill and good reputation, because once CROSSMARK trade secrets are improperly used and disclosed, they are forever lost and such loss is cannot be calculated in money damages. Further, CROSSMARK's customer and client goodwill, which has been developed over many years, will be harmed and such harm cannot be quantified in money damages.
>
> The damage that will be caused to CROSSMARK by the Former Employees' probable and actual breach of the Confidentiality Agreements, the Former Employees' use and disclosure of CROSSMARK Confidential Information and Trade Secrets, and Product Connections and Rose's tortious interference and Product Connections' misappropriation and probable disclosure of CROSSMARK Confidential Information and Trade Secrets, cannot be adequately compensated by money damages, leaving CROSSMARK with no adequate legal remedy. In addition, the only way to remedy the Former Employees' breaches of their non-compete and non-solicitation obligations is through this equitable relief. Unless Defendants and all others through or with whom Defendants are acting are enjoined as requested herein, CROSSMARK will suffer irreparable injury and harm for which it lacks an adequate remedy of law.
>
> The Court further finds that CROSSMARK will suffer imminent and irreparable harm unless Defendants are immediately restrained and enjoined as set forth below.
>
> Consequently, the Court finds that a temporary injunction is necessary because it appears to the Court that the Former Employees are presently engaged in, or will engage in, the use and disclosure of CROSSMARK Confidential Information and Trade Secrets, and Product Connections are presently engaged in, or will engage in, tortiously interfering with agreements CROSSMARK has with its employees and clients and customers and misappropriation of CROSSMARK's trade secrets, such that immediate relief is necessary to protect CROSSMARK's contractual rights pending a trial on the merits. Further, the harm is irreparable because of the lack of any remedy at law to adequately compensate CROSSMARK for the damage which may be done to CROSSMARK's trade secrets. Defendants' use and disclosure of CROSSMARK's trade secrets and

other confidential information, and/or probable misappropriation of CROSSMARK's trade secrets will also irreparably harm CROSSMARK.

Though much of this provision is conclusory, two portions address "reasons why" Crossmark will suffer irreparable injury: "because once CROSSMARK trade secrets are improperly used and disclosed, they are forever lost and such loss is cannot be calculated in money damages" and "CROSSMARK's customer and client goodwill, which has been developed over many years, will be harmed and such harm cannot be quantified in money damages." These portions specifically pertain to the use and disclosure of Crossmark's trade secrets, which are the focus of the temporary injunction's twelve prohibitive provisions. Thus, we conclude the temporary injunction adequately explains the reasons why irreparable injury will result absent the relief in those twelve provisions.

As to the additional injunctive relief in the DTO—the turnover of appellants' digital storage devices for examination—the temporary injunction order does not address or explain why this mandatory relief is "necessary" to prevent irreparable injury or extreme hardship, or why legal remedies regarding discovery of electronic storage devices are inadequate. *See Health Care Servs*., 495 S.W.3d at 238; *see also In re Weekley Homes, L.P*., 295 S.W.3d 309, 320–22 (Tex. 2009) (orig. proceeding) (explaining discovery rules' procedures and requirements for examining opponent's electronic storage devices). Thus, the mandatory injunction portion of the temporary injunction order is improper. *See Health Care Servs*., 495 S.W.3d at 238; *see also El*

*Tacaso*, 356 S.W.3d at 747 (concluding temporary injunction order's "conclusory statement" that applicant "has shown that it will suffer an irreparable injury for which it has no other adequate legal remedy" did not satisfy rule 683's requirement to "specify the reasons why the applicant will suffer irreparable harm for which there is no adequate remedy at law").

**Specific and definite terms**

Additionally, appellants complain rule 683's requirements are not met because the temporary injunction's "undefined, vague, and inconsistent terms" force appellants "to speculate regarding whether their lawful conduct might violate the Injunction." According to appellants, the temporary injunction (1) "does not define Crossmark's trade secrets, confidential information, and proprietary information in any meaningful way, and instead inconsistently uses those terms to improperly enjoin lawful conduct that has no connection to this dispute," and (2) "prohibits conduct with respect to wide swath of unidentified current, former, even potential 'customers and clients' of Crossmark—regardless of whether Appellants secured that relationship independent of or after any connection to Crossmark."

The temporary injunction order states:

> The Court finds CROSSMARK possesses trade secrets, confidential information, and other proprietary information relating to its "playbook," digital transformation strategy, including its "Digital Demo Product" (collectively the "Digital Transformation Strategies"), its analytics and insight tools (the "Analytics Tools"), its customer and client contact lists (the "Contact Lists"), confidential pricing and costing strategy and analysis pertaining to its customers and clients (the "Customer Financial Strategy"), which were created through its

substantial expenditure of labor, skill and money. The "playbook" referenced above includes confidential information such as best practices, protocols, operating procedures, manuals, training guides, and other documents that enable CROSSMARK to adequately run its programs, including events, samplings, retail, alcohol beverage ("AB"), and juicing programs (collectively, the "Playbook"). Collectively for purposes of this Temporary Injunction, the Digital Transformation Strategies, the Analytics Tools, Contact Lists, Customer Financial Strategy and Playbook are referred to herein as the "CROSSMARK Confidential Information and Trade Secrets."

According to appellants, (1) "none of the subcategories used to define [CROSSMARK Confidential Information and Trade Secrets] are described with sufficient particularity" and (2) the order's definitions regarding those subcategories "are too vague to instruct Appellants regarding what they are required to do." We are not persuaded by appellants' argument that the order's use of "generic words" to define key terms precludes understanding—particularly when the individual appellants are all former Crossmark employees. The order specifically describes each component of Crossmark's "Confidential Information and Trade Secrets" and clearly defines that term. To the extent the order uses that term, there is no lack of specificity.

But the order also states, "The Court further finds that the CROSSMARK Confidential Information and Trade Secrets and other confidential and proprietary business information of CROSSMARK and business relationships of CROSSMARK are assets belonging solely to CROSSMARK." The terms "confidential," "proprietary," and "business information" are not defined or explained anywhere in the order, nor does the order's context clarify them in any

discernable way. These undefined terms are used in provisions (b), (d)(ii), (i), (j) and (k).[4] These terms are vague and fail to provide adequate notice to appellants of the acts they are restrained from doing in terms not subject to reasonable disagreement. *See Ramirez v. Ignite Holdings, Ltd*., No. 05-12-01024-CV, 2013 WL 4568365, at *4 (Tex. App.—Dallas Aug. 26, 2013, no pet.) (mem. op.) (concluding temporary injunction violated rule 683 because it failed to define "Proprietary Information/Trade Secrets" with "enough specificity to give appellants notice of the acts they are restrained from doing"); *see also Cooper Valves, LLC v. ValvTechnologies, Inc*., 531 S.W.3d 254, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Thus, provisions (b), (d)(ii), (i), (j), and (k) violate rule 683's specificity requirement.[5] *See Ramirez*, 2013 WL 4568365, at *4.

Additionally, the temporary injunction order states:

> For purposes of this Temporary Injunction, "Covered Clients and Customers" means those persons or entities that CROSSMARK provided services to and that the Former Employees either had contact with, supervised employees who had contact with, or received proprietary information about within the last twenty-four (24) months period that they were employed by CROSSMARK.

---

[4] We note that the language of provisions (i) and (j) inexplicably enjoins "prohibiting" and "restraining" appellants from certain acts. We address those provisions here to the extent the trial court's intent was to enjoin the acts themselves.

[5] Appellants assert that because provision (a) uses the term "confidential," that provision also lacks the required specificity. We disagree. That provision's language indicates the term "confidential" was meant to be used in the context of the properly defined term "Crossmark Confidential Information and Trade Secrets." *See HMS Holdings Corp. v. Public Consulting Grp*., No. 05-15-00925-CV, 2016 WL 1179436, at *4 (Tex. App.—Dallas Mar. 28, 2016, no pet.) (mem. op.) ("The terms and paragraphs being challenged . . . must be read in the context of the injunction order as a whole.").

Appellants contend this "broad and nebulous definition" does not satisfy rule 683 because "[i]t is impossible for Appellants to know with certainty all of the 'Covered Clients and Customers' that they or someone they supervised may have serviced or for which they may have once received a spreadsheet containing information about." We agree with appellants that this definition does not meet rule 683's specificity requirement. The meaning of "had contact with" is not clear, nor does the definition address how appellants would know whom their supervised employees "had contact with." *See Computek Comput. & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 220–21 (Tex. App.—Dallas 2005, no pet.) ("An injunction must be as definite, clear, and precise as possible and when practicable it should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing."). The term "Covered Clients and Customers" is used in provisions (e), (g), and (l)(iv). Thus, those provisions lack rule 683's required specificity.[6]

Appellants also complain provisions (c), (d)(i), (f), (h), and (l)(i) are invalid due to other non-specific terms. According to appellants, provision (c) is "overly broad" and "facially impermissible" because its language would prohibit interfering

---

[6] Provision (e) is limited to "a period of (6) months." Thus, any complaint regarding that provision became moot on April 21, 2021. Because appellate courts are prohibited from deciding moot controversies, *see Nat'l Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999), our conclusions herein pertain only to the temporary injunction's non-moot portions.

with an "at-will employment relationship." We disagree that the term "contracts and agreements" in provision (c) is overly broad or encompasses every type of relationship. Rather, provision (c) adequately specifies and reasonably details the conduct prohibited. *See* TEX. R. CIV. P. 683.

As to provision (d)(i), appellants complain of the language enjoining the former-employee appellants from recruiting "any persons formerly or currently employed by or associated with Crossmark." Appellants contend this provision is "so facially broad" that it "impermissibly enjoin[s] lawful conduct," as "there is no legal basis to enjoin Appellants from recruiting individuals who have left Crosmmark's employment or who are not employed but merely 'affiliated' with Crossmark." We agree. The term "associated with" is undefined and lacks specificity. Further, "[w]here . . . some acts are permissible and some are not, an injunction should not issue to restrain actions that are legal or about which there is no asserted complaint." *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 384 (Tex. App.—Dallas 2009, no pet.). We conclude provision (d)(i) is invalid.

Regarding provision (f), appellants complain of the language enjoining them from "directly or indirectly . . . taking any steps to cause any current client or customer of CROSSMARK, including [Client X and Client Y], to divert, withdraw, curtail or cancel any of their business with CROSSMARK." We agree with appellants that this provision lacks specificity not only as to the undefined term "current client or customer," but also as to "indirectly . . . taking any steps" to cause

–28–

diversion of business from Crossmark. *See Computek*, 156 S.W.3d at 220–21. Thus, provision (f) does not meet rule 683's specificity requirement.

Appellants contend that though provision (h) "may seem more tailored" because it prohibits them from soliciting only two specific clients, this provision is actually "incredibly broad" because it "prohibit[s] Appellants from reaching out not only to retailers where Crossmark's product demonstrations occur . . . but to the companies who make the products being displayed or demonstrated." But appellants' argument in support of that position addresses provisions (g) and (h) together and focuses on the term "Crossmark covered Customers and Clients" in provision (g), which we rejected above as lacking specificity. Appellants do not explain, and the record does not show, how provision (h) itself extends beyond Client X and Client Y. We cannot agree with appellants that provision (h) lacks specificity or is overbroad. *See* Tex. R. Civ. P. 683; *see also HMS Holdings Corp. v. Public Consulting Grp.*, No. 05-15-00925-CV, 2016 WL 1179436, at \*3 (Tex. App.—Dallas Mar. 28, 2016, no pet.) (mem. op.) ("So long as the injunction is narrowly tailored, the fact that it may have the effect of restraining some competition does not render it an abuse of discretion.").

As to provision (l)(i), appellants complain that the scope of its restriction pertaining to "existing or prospective customers or clients of CROSSMARK" is "undefined and overbroad" because "it would prohibit Appellants from deleting anything 'relating in any way' to *potential* customers of Crossmark." They argue

–29–

provision (l)(i) impermissibly enjoins them from "deleting data that is wholly unrelated to the subject matter of the lawsuit." We agree that the term "existing or prospective customers or clients of CROSSMARK" lacks the specificity rule 683 requires.[7] *See* TEX. R. CIV. P. 683.

Finally, appellants contend the DTO lacks the specificity rule 683 requires because it contains similarly deficient undefined terms, including "CROSSMARK information" and "other digital storage devices." We agree with appellants that those terms are too vague to inform them what is required of them without calling for inferences or conclusions about which persons might well differ. *See Computek*, 156 S.W.3d at 220–21. Thus, in addition to its irreparable-injury deficiency already described above, the DTO is improper due to lack of specificity of those terms.

**Propriety of mandatory injunctive relief regarding electronic devices**

In their third issue, appellants assert this Court should vacate the DTO "for the additional reason that a trial court cannot circumvent Texas rules and procedures governing the permissible scope and proper conduct of electronic discovery by compelling pretrial electronic discovery under the guise of a mandatory injunction." Appellants cite the Texas Rules of Civil Procedure governing discovery, which, among other things, specifically address "electronic or magnetic data" and establish a procedure for seeking the court's protection from improper requests. *See* TEX. R.

---

[7] Appellants' rule 683 complaints on appeal do not specifically address provisions (l)(ii) or (l)(iii), nor do those provisions contain any of the deficient terms described above.

CIV. P. 192–96. Appellants argue there is no "other statutory mechanism for pursuing pretrial electronic discovery by mandatory injunction" and "the trial court abused its discretion by compelling pretrial 'production' and 'inspection' of Appellants' computers and other devices through the Device Turnover Order instead of the rules governing and limiting the scope of that discovery."

Appellants also contend the DTO "grants Crossmark's attorneys direct, immediate, and unfettered access to Appellants' devices without the procedural protections required by the Texas Supreme Court in *In re Weekley Homes.*" *See Weekley*, 295 S.W.3d at 311, 322 (summarizing "proper procedure" for electronic discovery under Texas Rule of Civil Procedure 196.4 and concluding trial court abused its discretion by ordering defendant's employees to turn over computer hard drives to plaintiff's forensic experts for searching where plaintiff failed to demonstrate "the particular characteristics of the electronic storage devices involved, the familiarity of its experts with those characteristics, or a reasonable likelihood that the proposed search methodology would yield the information sought"). According to appellants, "The fact that the trial court granted this relief under the guise of a mandatory inunction—with the threat of contempt—does not change the order's nature as one compelling pretrial electronic discovery. Thus, *In re Weekley Home*s applies."

*Weekley* involved rule 196.4 discovery rather than a temporary injunction and was not a trade secrets case. Appellants cite no authority mandating *Weekley*'s

application here and we have found none. Further, the law governing mandatory injunctive relief is consistent with *Weekley*'s requirement that "trial courts should be mindful of protecting sensitive information and utilize the least intrusive means necessary to facilitate discovery of electronic information." *Id.* at 321. As described above, rule 683 requires an injunction order to be specific and detailed and to "set forth the reasons for its issuance." TEX. R. CIV. P. 683; *see El Tacaso*, 356 S.W.3d at 747 (temporary injunction order must "specify the reasons why the applicant will suffer irreparable harm for which there is no adequate remedy at law"). And a preliminary mandatory injunction is proper only if a mandatory order is "necessary" to prevent irreparable injury or extreme hardship. *See Health Care Servs.*, 495 S.W.3d at 238. Though the DTO in this case is deficient for the reasons described in our analysis above, we cannot conclude Texas law entirely precludes mandatory injunctions requiring production of digital storage devices when the applicable standards—including rule 683's specificity and irreparable injury requirements—are met.

## Conclusion

We reverse the DTO and the temporary injunction order's provisions (b), (d)(i), (d)(ii), (e), (f), (g), (i), (j), (k), (l)(i), and (l)(iv) for defects of form. We otherwise affirm the trial court's order.

Additionally, we must determine whether we can reform the trial court's order or whether it is necessary to remand for further proceedings. *See* TEX. R. APP. P.

–32–

43.3(a). Appellants contend the temporary injunction order "is not capable of being sufficiently reformed" by this Court because it requires substantial modifications more appropriate for the trial court's consideration. We agree. Following our approach in similar cases, we remand this matter to the trial court for further proceedings consistent with this opinion, including consideration of protections for Crossmark's confidential information that comply with rule 683. *See Ramirez*, 2013 WL 4568365, at *4; *Computek*, 156 S.W.3d at 224; *see also Cooper Valves*, 531 S.W.3d at 267.

/Cory L. Carlyle//
CORY L. CARLYLE
JUSTICE

200937f.p05



## Court of Appeals
## Fifth District of Texas at Dallas

**JUDGMENT**

RETAIL SERVICES WIS CORPORATION
D/B/A PRODUCT CONNECTIONS,
NATHAN STOUT, AMANDA VILLA, AND
KATHERINE PALMER, Appellants

No. 05-20-00937-CV          V.

CROSSMARK, INC., Appellee

On Appeal from the 429th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 429-05122-2020.
Opinion delivered by Justice Carlyle. Justices
Schenck and Reichek participating.

In accordance with this Court's opinion of this date, the trial court's order is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** the "Device Turnover Order" portion of the trial court's order and provisions (b), (d)(i), (d)(ii), (e), (f), (g), (i), (j), (k), (l)(i), and (l)(iv). In all other respects, the trial court's order is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 4th day of May, 2021.